Case 3:18-cv-00186-MMH-JRK   Document 7   Filed 09/09/19   Page 1 of 19 PageID 32

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

[UNDER SEAL],

    Relator-Plaintiff,

v.

[UNDER SEAL],

    Defendants.

**SEALED AMENDED COMPLAINT**

Case No.: <u>3:13CV186J34J4K</u>

**FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2) & (3)**

## SEALED

*Do Not Place in Press Box or Enter on Publicly Accessible System (PACER)*

FILED 2018 FEB 22 PM 2:30
CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,

*Ex rel Curtis Booth,*
*Relator-Plaintiff,*

v.

HUNTINGTON INGALLS INDUSTRIES, INC.,

and

HUNTINGTON INGALLS INCORPORATED,

**Defendants.**

*UNDER SEAL*
*PURSUANT TO 21*
*U.S.C. §3730(b)(2)*

Case No. <u>3:18-cv-186-J-34-JRK</u>

**Do Not Place In Press Box or Enter On Publicly Accessible System (PACER)**

### AMENDED FALSE CLAIMS ACT COMPLAINT
### AND DEMAND FOR JURY TRIAL

On behalf of the United States of America, Relator-Plaintiff, Curtis Booth (hereinafter "Relator"), by counsel, files this *qui tam* Amended Complaint against Huntington Ingalls Industries, Inc. ("Huntington Ingalls" or "HII") and Huntington Ingalls Incorporated d/b/a Newport News Shipbuilding, a Tenneco Company ("Huntington Ingalls Incorporated" or "Newport News Shipbuilding") (herein collectively referred to as "Defendants"), and alleges as follows:

**I.      INTRODUCTION**

1. This is an action to recover treble damages and civil penalties in excess of $25 million dollars on behalf of the United States of America from Defendants for knowingly and/or

recklessly presenting false claims to the United States government in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq. Defendants falsified testing and certifications on a multi-billion dollar submarine contract, which induced the Government to pay Defendants substantial sums for a submarine with dangerous defects that put American lives at risk.

## II.   PARTIES, JURISDICTION AND VENUE

2.   Prior to the filing of the Complaint, Relator has previously provided to the United States Attorney for the Middle District of Florida certain information related to this Amended Complaint. The disclosed information is supported by material evidence known to the Relator establishing the existence of Defendants' false claims. Because the disclosed information includes attorney-client communications and work product of Relator's attorneys, and is submitted to the United States Attorney in his capacity of potential co-counsel in the litigation, the Relator understands this disclosure to be confidential.

3.   The Relator, Curtis Booth, is a citizen of the United States and a resident of the Commonwealth of Virginia. He was a Shipfitter in Department X10 (Structural Fabrication) for Newport News Shipbuilding between 2012 and 2017 and was involved in the fabrication of a portion of the pressure hull for the Virginia Class submarine SSN 792/NN 678, which is to become the USS Vermont. This work was performed at the Newport News Shipbuilding facility in Newport News, Virginia.

4.   Huntington Ingalls Industries, Inc. ("Huntington Ingalls" or "HII") is a corporation organized and existing under the general corporation law of the state of Delaware. Huntington Ingalls is America's largest military shipbuilding company with its headquarters in Newport News, Virginia. Huntington Ingalls employs approximately 37,000 people operating both domestically and internationally. Huntington Ingalls also performs work in Pascagoula,

2

Mississippi; Virginia Beach, Virginia; Broomsfield, Colorado; Panama City, Florida; Houston, Texas; and San Diego, California and also has employees in various places throughout the nation, including Groton, Connecticut; Kingston, Rhode Island. Huntington Ingalls' website also states that it maintains offices in Jacksonville, Florida for its Technical Solutions Division as wells as Ingalls Shipbuilding.[1] It also states that Huntington Ingalls maintains offices for its Technical Solutions Division in Orlando, Florida and in Tampa, Florida. It also maintains a separate division for Universal Pegasus in Tampa, Florida. Huntington Ingalls also states that it maintains offices in Pensacola, Fort Walton, and Panama Beach City, Florida for its Technical Solutions Division. Huntington Ingalls also frequently dispatches employees, including consultants and engineers to perform repair and trouble-shooting work on naval vessels throughout the world including warships located at U.S. Naval Station Mayport in Jacksonville, Florida.

5. Huntington Ingalls Incorporated is a Virginia Corporation. Furthermore, Huntington Ingalls Incorporated has filed a fictitious name statement with the Virginia State Corporation Commission indicating that it also operates under the name of Newport News Shipbuilding, a Tenneco Company. Huntington Ingalls Industries, Inc. publicly advertises that Newport News Shipbuilding is a division of Huntington Ingalls Industries, Inc. As a result, upon information and belief, Huntington Ingalls Incorporated is a division of and wholly-owned subsidiary of Huntington Ingalls Industries, Inc. In addition, Huntington Ingalls and Newport News Shipbuilding have common ownership, an integrated management structure and their operations and operational plans are intertwined. The managing officers of Newport News Shipbuilding ultimately reported and answered to executives at Huntington Ingalls at all times relevant to this Amended Complaint.

---

[1] http://www.huntingtoningalls.com/who-we-are/where-we-are/

6. The United States District Courts have exclusive jurisdiction over actions brought under the FCA pursuant to 31 U.S.C. §3732, and otherwise have jurisdiction under 28 U.S.C. §§1331 and 1345. At all times relevant hereto, the Defendants regularly conducted substantial business in Florida. Accordingly, the Defendants are subject to personal jurisdiction in this District. Venue is appropriate in the Middle District of Florida pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391(b)(1) and (2).

7. Section 3732(a) of the FCA provides that "any action under Section 3730 may be brought in any judicial district in which the defendant, or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by Section 3729 occurred."

8. Relator began employment with Newport News Shipbuilding in 2012 as a Shipfitter. He left Newport News Shipbuilding after approximately six months to pursue other interests but was rehired on March 12, 2014 in the same position and continued his employment with Newport News Shipbuilding until October 11, 2017. He voluntarily left his employment for reasons unrelated to this Complaint. He has direct knowledge of the facts herein and is the original source of the same. While he is unaware of any of the counts, fraud allegations and/or any of the acts described herein in violation of 31 U.S.C §3729 having been publicly disclosed as contemplated under 31 U.S.C. §3730(d)(4)(B), he has made voluntary disclosure of substantially all evidence and information in his possession to authorities responsible for investigating these allegations prior to filing the Complaint and is an original source of the information contained in the Complaint and this Amended Complaint.

9. Under the FCA, this Amended Complaint is to be filed *in camera* and remain under seal until the Court orders otherwise.

4

## III. FACTS COMMON TO ALL COUNTS

### A. Introduction

10. Newport News Shipbuilding is a division of Huntington Ingalls located in Newport News, Virginia. Virginia-class submarines are built through an arrangement between Newport News Shipbuilding, in Newport News, Virginia and General Dynamics Electric Boat in Groton, Connecticut (hereinafter referred to as "Electric Boat"). Under the arrangement, the Newport News Shipbuilding facility in Newport News builds the stern, bow (including sections of the pressure hull rings), habitability and machinery spaces, torpedo room, and sail; whereas, Electric Boat builds the center portion of the pressure hull rings, engine rooms, and the command and control system modules. Huntington Ingalls and Electric Boat alternate work on the reactor plant. Modules are shipped to whichever yard is delivering a particular ship, where final assembly, testing, outfitting and delivery of the ship are performed.

11. The Relator was a Shipfitter at Newport News Shipbuilding in Department X10 (Structural Fabrication) when he was involved in the fabrication of sections or "rings" of the pressure hull for SSN 792/NN 678, which is to become the USS Vermont.

### B. Background of Virginia-Class Submarines/Contracts

12. In 1998, the United States Navy awarded a $4.2 billion dollar contract for the construction of the first four boats of the class. USS Virginia (SSN-774) was the first of these. On December 22, 2008, the United States Navy awarded a $14 billion dollar contract to Electric Boat and Huntington Ingalls' predecessor (Northrop Grumman) for eight more Virginia-class submarines. The contract called for the delivery of one submarine in each fiscal year of 2009 and 2010 and two submarines in each fiscal year 2011, 2012 and 2013. In December of 2010, the United States Congress passed a defense authorization bill that expanded production to two submarines per year, which resumed on September 2, 2011, with the commencement of

construction of the USS Washington (SSN-787).

13. The Virginia-class submarines have been constructed in "Blocks." These Blocks are summarized in Table I below that includes the status of the construction and/or delivery of the vessels and further includes the internal designation or ship number used by Newport News Shipbuilding.

Table I – Virginia-Class Submarine Construction

| Block | Name & Hull # | Newport News Ship Number | Status | Final Delivery By | Contract Amount | Contract Number |
|---|---|---|---|---|---|---|
| I | USS Virginia (SSN-774) | | Commissioned and in service | Electric Boat | | |
| I | USS Texas (SSN-775) | | Commissioned and in service | Newport News Shipbuilding | | |
| I | USS Hawaii (SSN-776) | | Commissioned and in service | Electric Boat | | |
| I | USS North Carolina (SSN-777) | | Commissioned and in service | Newport News Shipbuilding | | |
| II | USS New Hampshire (SSN-778) | | Commissioned and in service | Electric Boat | | |
| II | USS New Mexico (SSN-779) | | Commissioned and in service | Huntington Ingalls | | |
| II | USS Missouri (SSN-780) | | Commissioned and in service | Electric Boat | | |
| II | USS California (SSN-781) | | Commissioned and in service | Huntington Ingalls | | |
| II | USS Mississippi (SSN-782) | | Commissioned and in service | Electric Boat | | |

| Block | Name & Hull # | Newport News Ship Number | Status | Final Delivery By | Contract Amount | Contract Number |
|---|---|---|---|---|---|---|
| II | USS Minnesota (SSN-783) | | Commissioned and in service | Huntington Ingalls | | |
| III | USS North Dakota (SSN-784) | NN 669 | Commissioned Delivered Aug.29,2014 | Electric Boat | | |
| III | USS John Warner (SSN-785) | NN 670 | Commissioned and in service on P.S.A | Huntington Ingalls | | |
| III | [Illinois] SSN-786 | NN 671 | Christened in 10/15 | Electric Boat | | |
| III | [Washington] SSN-787 | NN 672 | Christened in 03/16 | Huntington Ingalls | | |
| III | [Colorado] SSN-788 | NN 673 | Under Construction | Electric Boat | | |
| III | [Indiana] SSN-789 | NN 674 | Under Construction | Huntington Ingalls | | |
| III | [South Dakota] SSN-790 | NN 675 | Under Construction | Electric Boat | | |
| III | [Delaware] SSN-791 | NN 677 | Under Construction | Huntington Ingalls | | |
| IV | [Vermont] SSN-792 | NN 678 | Under Construction | Electric Boat | $17,650,394,416 | N0002412C2115 |
| IV | [Oregon] SSN-793 | | Under Construction | Electric Boat | $17,650,394,416 | N0002412C2115 |
| IV | [Montana] SSN-794 | | Under Construction | Huntington Ingalls | $17,650,394,416 | N0002412C2115 |

7

| Block | Name & Hull # | Newport News Ship Number | Status | Final Delivery By | Contract Amount | Contract Number |
|---|---|---|---|---|---|---|
| IV | [Hyman G. Rickover] SSN-795 | | Under Construction | Electric Boat | $17,650,394,416 | N0002412C2115 |
| IV | [New Jersey] SSN-796 | | Under Construction | Huntington Ingalls | $17,650,394,416 | N0002412C2115 |
| IV | [Iowa] SSN-797 | | Under Construction | Electric Boat | $17,650,394,416 | N0002412C2115 |
| IV | [Massachusetts] SSN-798 | | Under Construction | Huntington Ingalls | $17,650,394,416 | N0002412C2115 |
| IV | [Idaho] SSN-799 | | On order | Electric Boat | $17,650,394,416 | N0002412C2115 |
| IV | SSN-800 | | On order | Huntington Ingalls | $17,650,394,416 | N0002412C2115 |
| IV | [Utah] SSN- | | On order | Electric Boat | $17,650,394,416 | N0002412C2115 |

14. A contract for the ten Virginia-class boats shown in Table 1 for the period of FY2014-FY2018 (referred to as the Block IV boats) was awarded by the Navy to General Dynamics Electric Boat and the Huntington Ingalls subsidiary Newport News Shipbuilding under a multiyear procurement (MYP) that was approved by Congress as part of its action on the FY2013 budget on April 28, 2014. The award identification number was N0002412C2115 and the base and exercise options value of the contract was $17,650,394,416. The construction of SSN 792/NN 678 is included within this block. The eight Virginia-class boats procured in FY 2009-FY2013 (Block III boats) were procured under a previous MYP contract, and the five Virginia-class boats procured in FY2004-FY2008 (Block II boats) were procured under a still-earlier MYP contract. The four boats procured in FY1998-FY2002 (the Block I boats) were procured under a block buy contract, which is an arrangement somewhat similar to an MYP contract. The boat procured in FY2003 fell between the FY1998-FY2002 block buy contract and

the FY2004-FY2008 MYP arrangement, and was contracted for separately.

### C. Construction of Virginia-Class Submarines

15. As discussed, *supra*, construction work on the Virginia-class submarines is evenly split between Newport News Shipbuilding and Electric Boat. Each shipyard is responsible for particular parts of each ship, and alternate with hull erection, assembly, sea trials and delivery.

16. Electric Boat builds a portion of the pressure hull rings (the center portion), engine rooms, and command and control systems modules. Newport News Shipbuilding builds the ends of the ship (including the portion of the pressure hull towards the ends), weapons modules, habitability modules, auxiliary machine room modules and the fairwater.

17. Newport News Shipbuilding and Electric Boat alternate as to which shipyard will deliver particular boats. The modules are delivered to whichever shipyard is delivering the ship and assembled at that location.

18. The pressure hull is designed to withstand the outside pressure and maintain normal atmospheric pressure inside. The structural design of a submarine always begins with the process of identifying the loads that the structure would be subjected to while in use. This would include consideration of loading due to dive pressure and shock loads that a submarine may encounter as a result of underwater detonations. When a submarine is subjected to an explosion, it should be able to withstand not one, but a series of shock waves.[2]

19. Class I structures are the structures which if damaged, would render the submarine completely incapable of carrying out any operation or remain afloat, and would also pose a threat to the safety of the personnel.[3] The complete primary structure of the pressure hull

---

[2] Understanding Structure Design of a Submarine. By Soumya Chakraborty | In: Naval Architecture | Last Updated on September 30, 2017. https://www.marineinsight.com/naval-architecture/submarine-design-structure-of-a-submarine/
[3] *Id.*

9

(the shell and the stiffeners) is Class I structure. Strictest non-destructive testing requirements are followed for certification of the quality of these structures.

20. "The design and analysis of submarine structures is a process that is way more complex than that of ship structures due to improbabilities of shock loads coming into effect. Every submarine design company conducts extensive finite element analysis for a combination of load cases that the structure could be subjected to."[4]

21. The construction of the pressure hull also requires a high degree of precision. Even an inch (25 millimeter) deviation from cross-sectional roundness results in over a thirty percent (30%) decrease in the ability to bear hydrostatic load. Accordingly, minor deviations from cross-sectional roundness could result in catastrophic failure of the pressure hull in challenging circumstances.

### D.     Circularity Testing

22. In September of 2015, the Relator was working in Department X10 (Structural Fabrication) for Newport News Shipbuilding, and was directly involved in the assembly of a portion of the pressure hull rings for the SSN 792/NN 678 (to be the USS Vermont). These sections were ultimately delivered to Electric Boat, who is responsible for delivery of this boat.

23. In fact, just the previous month, on August 12, 2015, Relator had been selected as a third-quarter Excellence in Action honoree for his efforts in support of the Virginia-Class Impulse Tank Manufacturing Process.

24. After initial assembly of sections of the pressure hull for SSN 792/NN 678, in approximately September of 2015, Department O68 (Dimensional Control Department) inspected these sections of the pressure hull and performed what has been characterized as a preliminary circularity test.

---

[4] *Id.*

25. As a result of the circularity test, it was determined that there was a flat area on the pressure hull that did not conform to contractually required circularity specifications. Relator estimates the flat area to be approximately three to five feet in width and approximately five to six feet in length (with the length being measured forward to aft). Relator has indicated that the defective area exists between frames 25 and 27 on the starboard side of the boat. He asserts the defect may have crossed frame 26. This area is directly behind the torpedo tubes.

26. When the defect was discovered during the preliminary circularity test, Glen LeBlanc ("LeBlanc"), a foreman and "inspector," instructed Relator[5] to use a 50-ton cylindrical jack (commonly referred to as a ram) inside the pressure hull to exert pressure on the hull to push out the flat area. Under LeBlanc's plan, once the pressure hull was expanded outwardly, steel flat bar would be welded in-place between the interior wall of the pressure hull and a temporary structure (or fixture) that was located within the pressure hull for the purposes of fabrication. LeBlanc instructed Relator to install the flat bar so that the pressure hull would pass the circularity testing, but indicated that once the testing was complete, the flat bar welded to the temporary structure would be cut out and removed. It was obvious to Booth that this would allow the defect (flat area) to reappear. LeBlanc further instructed Relator that he was not to repeat these instructions to anyone. Relator refused to perform the actions that LeBlanc had instructed him to perform.

27. When LeBlanc provided Relator the instructions described in the preceding paragraph, he showed Relator a document which he represented to be the results of a photogrammetric or laser circularity test conducted by Department 068. The document presented a likeness of the pressure hull with numbers along its circumference some of which

---

[5] While Relator is not certain of the exact date on which LeBlanc gave this instruction, he believes it was given on Friday, September 18, 2015.

11

were shown in red. LeBlanc represented to Relator that the numbers in red represented the flat area. Upon information and belief, this document and the information contained within it was retained and archived in digital format.

28. Andy Dorner ("Dorner"), acting "make-up" Foreman for Department X10, was present when LeBlanc instructed Relator to perform these actions. Upon information and belief, Dorner currently works for Newport News Industrial ("NNI") which is a subsidiary of Huntington Ingalls. Following the meeting with LeBlanc, Dorner advised Relator that he did not blame Relator for refusing to assist in falsifying the results of the circularity test.

29. After the meeting with LeBlanc, Relator met with General Foreman, Wesley Sheppard ("Sheppard"), and advised him of what LeBlanc had instructed him to do, and further advised that he did not want to assist in falsifying the testing. In response, Sheppard stated "that's what Pat wants." Relator understood Sheppard to be referring to Pat Cullins ("Cullins"), who was the Acting Director of Department X10 (Structural Fabrication).

30. The meeting with LeBlanc and follow-up conversations with Dorner and Sheppard all occurred on a Friday. That same day, attempts were made by Sheppard and Mike Lowers ("Lowers"), to persuade Relator not to report the fraudulent conduct. Sheppard and Lowers told Relator that they did not want the Navy investigating circularity as the Navy had already been looking at issues of circularity at Electric Boat.

31. The following Monday, Cullins attempted to persuade Relator that the conversation with LeBlanc had simply been a "miscommunication" and that they had just been looking at options. Shortly thereafter, a meeting occurred between Relator, Sheppard, David Washburn ("Washburn") (a temporary nightshift Foreman for Department X10), Relator's brother, and others, wherein Sheppard stated he was concerned about Relator and his conduct.

Relator made it clear during the meeting that he felt their concerns stemmed from his refusal to assist in concealing the defect and falsifying the circularity testing.

32. Following that meeting, Relator called the Huntington Ingalls OpenLine and reported what he considered to be fraud. He specifically named Cullins, Sheppard and LeBlanc in his call as acting parties. Huntington Ingalls states on its website that it offers "an anonymous and confidential means to voice concerns or report suspected violations of our Code of Ethics and Business Conduct without fear of retaliation or coercion."[6] Huntington Ingalls' Code of Ethics and Business Conduct specifically includes Section 2.2 which states that an employee can contact the OpenLine to raise concerns about among other things "[p]rocurement fraud or contract fraud."[7] Under the same section, the policy states that "you have a duty to report allegations of fraud, waste, abuse, misuse, corruption, criminals or mismanagement. You can report to your supervisor, any level of management or directly to DOE Office of Inspector General." Relator also contacted his union representative and was ultimately told that the issue was above their capabilities.

33. Within twenty-four hours of making the first report identified in the preceding paragraph, Relator was transferred to a different department to work on aircraft carriers. Relator later spoke with Matt Morgan ("Morgan"), who is also a Shipfitter for Department X10, who informed Relator that he either saw himself, or heard, that the flat bar was in fact utilized to expand out the pressure hull and conceal the flat area on SSN 792/NN 678. Another person, a welder, in Department X10, whose is believed to be Stephen Krupowski, also informed Relator that the flat bar was installed. In any event, none of the officials involved in the events set forth in paragraphs 27 through 32, above, ever reported back to Booth, or otherwise made it known to

---

[6] http://www.huntingtoningalls.com/wp-content/uploads/2016/06/codeofethics.pdf
[7] http://www.huntingtoningalls.com/who-we-are/ethics-compliance/openline-and-contact-information/

13

him, that the flat area was repaired in an appropriate manner.

34. Following his transfer to work on aircraft carriers, Relator was approached by Steve Bonneau ("Bonneau"), who informed Relator that Sheppard told him that Relator was "volatile" and to watch out for him. Relator then explained to Bonneau his refusal to assist in the falsification of the circularity test, at which time Bonneau said he would look into it further. After inquiring, Bonneau was instructed by Joe Sabol ("Sabol"), Director of Department X10 (and perhaps also Director of Department O68, the department that conducted the circularity test), or someone in a closely related position, to get out of it and stop investigating. At this point, Relator called the "Stop" card hotline which he believes was to be directed to Matt Mulherin, Vice President of Huntington Ingalls and President of the Newport News Shipbuilding. Relator left information about the conduct and never heard back from anyone in response.

35. The United States has made substantial payments to the Defendants based on representations that SSN 792/NN 678, or components thereof, had been constructed in accordance with standards and tolerances required by applicable contract specifications. Upon information and belief, the Defendants have falsely, and either expressly or impliedly, made claims to the United States that the pressure hull of SSN 792/NN 678 met circularity standards required by contract. These claims were false and the United States has suffered significant damages as a result.

## IV. **SEPARATE COUNTS**

### COUNT I
### Scheme to Submit Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))

36. All allegations set forth in Paragraphs 1 through 8 and 10 through 35 of this Amended Complaint are incorporated into this Count as if fully set forth herein.

14

37. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

38. The United States, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent or false representations within the claims, approved, paid, and participated in payments that would otherwise not have been allowed or paid.

39. As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to three times the amount of actual damages sustained and at least $10,957 and up to $29,916 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT II
### Submission of Claims Containing False Express or Implied Certifications
### (31 U.S.C. § 3729(a)(1)(B))

40. All allegations set forth in Paragraphs 1 through 8 and 10 through 35 of this Amended Complaint are incorporated into this Count as if fully set forth herein.

41. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by defendant – material to false or fraudulent claims in violation of 31 U.S.C. §3729(a)(1)(B).

42. The United States, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent or false representations within the claims, approved, paid, and participated in payments that would otherwise not have been allowed or paid.

43. As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to three times the amount of actual damages sustained and at least $10,957 and up to $29,916 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT III
### False Claims Conspiracy (31 U.S.C. § 3729(a)(1)(C))

44. All allegations set forth in Paragraphs 1 through 8 and 10 through 35 of this Amended Complaint are incorporated into this Count as if fully set forth herein.

45. By means of the acts described above, Defendants knowingly conspired to defraud the United States by getting false or fraudulent claims allowed or paid by the United States.

46. The United States, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent or false representations within the claims, approved, paid, and participated in payments that would otherwise not have been allowed or paid.

47. As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to three times the amount of actual damages sustained and at least $10,957 and up to $29,916 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

### DEMAND FOR RELIEF

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendants as follows:

A. That the United States be awarded damages in the amount of three times the

damages sustained by the United States because of the false and fraudulent claims alleged within this Amended Complaint, as the Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

B.  That civil penalties be imposed in the maximum amount for each and every false and fraudulent claim that Defendants presented to the United States;

C.  That pre-judgment and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relators necessarily incurred in bringing and pursuing this action;

D.  That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this Amended Complaint;

E.  That pursuant to § 3730(d), Relator be awarded the maximum percentage of the amount recovered by the United States as a result of this action;

F.  That this Court award such other further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

Respectfully submitted,

John S. Vento, Esq. (FB No. 329381)
TRENAM LAW
101 E. Kennedy Boulevard, Suite 2700
Tampa, FL 33602
Telephone: 813-227-7483
Email: JVento@trenam.com
*Counsel for the Relator*

AND

James H. Shoemaker, Jr., Esq. (VSB No. 33148)
Scott L. Reichle, Esq. (VSB No. 40018)
Andrew J. Dean, Esq. (FB No. 121808)
PATTEN, WORNOM, HATTEN &
DIAMONSTEIN, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone: 757-223-4500
Email: jshoemaker@pwhd.com
Email: sreichle@pwhd.com
Email: adean@pwhd.com
*Counsel for Relator*
*Pro Hac Vice Admission pending for Mr.*
*Shoemaker and Mr. Reichle*

Kenneth R. Yoffy, Esq. (VSB No. 20549)
C. Thomas Turbeville, Jr., Esq. (VSB No. 30641)
YOFFY & TURBEVILLE, PLC
4805 Courthouse Street
Williamsburg, Virginia 23188
Telephone: 757-259-0800
Email: kyoffy@mac.com
Email: tomtlaw@mac.com
*Counsel for Relator*
*Pro Hac Vice Admission pending for Mr. Yoffy and*
*Mr. Turbeville*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing has been furnished by *Hand-Delivery* and/ or *U.S. Mail* to: **Maria Chapa Lopez** United States Attorney, United States Attorney's Office, 400 N. Tampa Street, Ste 3200, Tampa, FL 33602; **Civil Process Clerk**, 400 N. Tampa Street, Suite 3200, Tampa, FL 33602 and by *U.S. Mail* to **Jefferson Sessions**, United States Attorney General, Dept. Of Justice, 950 Pennsylvania Ave., N.W., Washington, D.C. 20530-001 on this 21st day of February, 2018.

Attorney